Jess M. Krannich (#14398)
Christopher M. Glauser (#12101)
Mitch M. Longson (#15661)
MANNING CURTIS BRADSHAW & BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
jkrannich@mc2b.com
cglauser@mc2b.com
mlongson@mc2b.com

*Attorneys for Plaintiffs Ivanti, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IVANTI, INC., <br><br> Plaintiff, <br><br> v. <br><br> STAYLINKED CORPORATION, <br><br> Defendant. | **COMPLAINT AND JURY DEMAND** <br><br> Civil No.  2:19-cv-00075-EJF <br><br> Magistrate Judge Evelyn J. Furse |

Plaintiff Ivanti, Inc. ("Ivanti"), through its undersigned counsel, brings this action against

Defendant StayLinked Corporation ("StayLinked"), and in support of its Complaint Ivanti

alleges as follows:

## INTRODUCTION

1.     This case arises from StayLinked's efforts to build its business through unfair and unlawful practices.

2.     Systematically and over the course of several years, StayLinked has built its business by targeting Ivanti, copying many of Ivanti's business strategies and products, hiring former Ivanti employees, and generally seeking any means of leverage vis-à-vis Ivanti, fair or unfair.  Indeed, StayLinked has made a practice of hiring former Ivanti employees and then leveraging them to obtain all manner of valuable inside, confidential, and proprietary information concerning Ivanti's strategies, technologies, and customers and using that information for its own benefit.

3.     Through its unlawful conduct, StayLinked has unfairly acquired and used Ivanti's valuable confidential information including internal details concerning Ivanti's customers, cost, pricing, sales, and financial matrices and data, internal information concerning projects, prototypes, and technologies, and sensitive competitive and strategic data.  StayLinked has in turned used and leveraged this information and Ivanti's former employees to cause direct harm to Ivanti by, among other things, interfering with Ivanti's customer, employee, and vendor relationships and misappropriating Ivanti's technologies.  Ivanti brings this Complaint to stop StayLinked's unfair practices and recover the damages StayLinked caused with its unlawful conduct.

## PARTIES

4.     Ivanti is a corporation formed under the laws of Delaware, with its headquarters and principal place of business in South Jordan, Utah.

5.      Upon information and belief, StayLinked is a corporation formed under the laws of California with its principal place of business in Tustin, California.

## JURISDICTION AND VENUE

6.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, as this Court has federal question jurisdiction under 18 U.S.C. § 1836 *et seq.*, and has supplemental jurisdiction over Ivanti's pendent state law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy and arise from the same nucleus of operative facts.

7.      Subject matter jurisdiction is also proper under 28 U.S.C. § 1332 because StayLinked and Ivanti are citizens of different states and there is more than $75,000 in controversy in this case.

8.      The Court has both general and specific personal jurisdiction over StayLinked because StayLinked does business in Utah generally and has regular and systematic contacts in this jurisdiction, and because StayLinked's wrongful conduct alleged herein involves, *inter alia*, the misappropriation and unlawful use of trade secrets and other confidential information created, kept, and used in Utah by Ivanti.  Further, StayLinked's wrongful conduct was directed at Utah citizen Ivanti and caused damage felt by Ivanti in this jurisdiction.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because at least a substantial part of the events alleged herein on which Ivanti's claims are based occurred and/or caused injury in this jurisdiction.

## GENERAL ALLEGATIONS

**Ivanti's Supply Chain Business and Terminal Emulation Products**

10.     Ivanti is an international IT solutions company that offers user-centered products and services designed to increase user productivity while reducing IT security risk, including supply chain software, products, and services.  These products and services are sold in interstate commerce to companies throughout the United States and beyond, and are used by some of the world's largest supply chains to manage their inventories.

11.     Formerly known as LANDesk, Ivanti was rebranded in early 2017 following the acquisition of another large software company.  Founded in 1985, LANDesk grew over the years, including—for example—through its 2012 acquisition of Wavelink, a provider of supply chain mobility software solutions throughout the world.[1]

12.     Relevant here is Ivanti's supply chain division, formerly housed in Wavelink, which generates revenue through sales of its supply chain mobility products and services.  These include terminal emulation products, which allow supply chain management customers' mobile workers to categorize and track products in the field using rugged mobile computers that interface directly with a central host system, rather than using separate devices or paper to track products that must later be logged into or synched with a central system.  These products greatly increase productivity and reliability for mobile supply chain workers.

---

[1] Any references to "Ivanti" herein refer also to LANDesk and/or Wavelink, as the case may be, unless otherwise noted.

**StayLinked's Relationship with Ivanti and Competition in the Terminal Emulation Arena**

13.     Years ago, Ivanti and StayLinked had a relationship in which StayLinked resold Ivanti's terminal emulation products.  This relationship ended in the early 2000s, and StayLinked thereafter began to develop its own terminal emulation products.

14.     StayLinked's products attempted to mirror various appearance, technological, and functional aspects of Ivanti's products.

15.     This evolution of StayLinked's products to resemble Ivanti's was made possible as StayLinked gained greater and greater access to Ivanti's technologies and strategies by hiring former high-level Ivanti employees and leveraging their knowledge.

16.     StayLinked has recruited and hired at least six former Ivanti, LANDesk, or Wavelink employees or contractors, some of whom were in high-level executive, technical, marketing, or sales positions and therefore intimately familiar with Ivanti's terminal emulation product development, intellectual property, and marketing and branding.

17.      Ever since its reselling relationship with Ivanti ended, StayLinked has also sought to gain market share from Ivanti in the supply chain mobility realm, particularly in the crucial Asia-Pacific region where several blue-chip Ivanti customers are based.

18.     Until recently, as discussed below, StayLinked had virtually no presence in the Asia-Pacific region, due in large part to Ivanti's superior product and established customer relationships with key players in the region.

19.     Without competitive terminal emulation products and the relationships necessary to obtain market share in the Asia-Pacific region, StayLinked apparently believed its only option was to usurp Ivanti's resources—quite literally, by hiring Ivanti employees who had a foothold

in the region and access to highly-sensitive Ivanti information, and misappropriating Ivanti's

confidential information and trade secrets—in order to become competitive with Ivanti.

**Ivanti's Development and Launch of its Cutting-Edge Terminal Emulation Product**

20.     Always seeking to improve its products and cater to the needs of its key

customers, Wavelink began developing a new terminal emulation concept and product in 2012,

before it had been acquired by Ivanti.  Wavelink envisioned a wholesale revision of the terminal

emulation concept in which telnet users would engage with an easy-to-use graphical interface,

rather than a rudimentary keyboard-based "green screen" setup.  By 2013, the project evolved

into an exclusive collaboration between Ivanti and its biggest customer and largest player in the

industry, aimed at meeting the customer's supply chain mobility needs and specifications.

21.     Ivanti's collaboration with its customer was confidential and unknown to Ivanti's

competitors.  The parties entered into a written agreement setting forth the terms and conditions

of the relationship, including strict nondisclosure requirements for both Ivanti and its customer.

The agreement also included sensitive terms and conditions, such as an exclusivity provision that

required Ivanti to market and sell the product exclusively alongside the customer's products for a

period of 12 months from launch.  After that point, Ivanti was permitted to market and sell its

product throughout the supply chain marketplace.

22.     Ivanti used an internal, confidential project name, "Smart TE," to refer to the

collaboration project.  This confidential code name was selected at Ivanti's customer's request

because the customer used the word "Smart" in many of its products and applications.

23.     Jay Cichosz ("Cichosz"), Vice President of Products and Marketing and a

longtime employee of Wavelink and later LANDesk who had long been involved in

development, marketing, and sales of the companies' terminal emulation products, was very familiar with the development of the "Smart TE" concept for Wavelink in its early stages in 2012.

24.     Cichosz worked on the front lines with Wavelink in developing the "Smart TE" concept and marketing that would effect a monumental shift in the way supply chain companies used terminal emulation products and applications.  Cichosz was thus intimately familiar with the market opportunity and purpose for such a product, and Wavelink's intent to seize on the opportunity.

25.     In the course of his work on the product for Wavelink and later sales work for LANDesk, Cichosz had access to and used copious amounts of confidential information and trade secrets used in planning, developing, and marketing Ivanti's terminal emulation products, including "Smart TE."  This includes, but is not limited to, the identity of the customer with whom Ivanti was collaborating to build the product, which was confidential prior to its initial launch; the confidential terms of Ivanti's agreement with its customer, including Ivanti's confidential, 12-month exclusivity arrangement with the customer; Ivanti's vision and plan for developing a best-in-class, Android-based terminal emulation product in collaboration with its customer; detailed knowledge of and information regarding Ivanti's "Smart TE" prototypes, including product design, features, functionality, and troubleshooting; Ivanti's terminal emulation marketing and go-to-market strategy, pricing, sales, and branding information; customer royalty reports; and lists of actual and potential customers, their product preferences, and other sensitive internal information valuable to Ivanti's customer relationships.  This also includes "negative trade secrets"—the lessons Ivanti learned as to what would *not* work in a

"Smart TE" product, lessons learned only as a result of Ivanti's substantial investment in research and development.   These various forms of confidential information directly related to, and facilitated development of, Ivanti's products for sale in interstate commerce.  This confidential information had independent economic value by virtue of its remaining secret; indeed, keeping the information secret allowed Ivanti to develop its solutions and establish itself as a market-leader.

26.     In addition to its protection under governing laws, the foregoing information is protected from disclosure and misappropriation by a strict "Confidential Information, Nonsolicitation, Noncompetition and Invention Assignment Agreement" (the "Agreement") between Cischosz and Ivanti, entered into on or around February 22, 2013 before "Smart TE" development began.

27.     Cichosz agreed that "at all times during his employment with the Company and thereafter," he would "hold in the strictest confidence, and not … use, except for the benefit for the Company, LANDesk Group, Inc. … to fulfill [his] employment obligations or to disclose to any person firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Group."

28. "Confidential Information" is defined broadly in the Agreement as

> any Group proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans products, methodologies, services, customer lists and customers (including, but not limited to, customers of the Group on whom I called or with whom I became acquainted during my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Group either directly or

8

> indirectly in writing, orally or by drawings or observation of parts
> or equipment.

29.     Ivanti goes to great lengths to preserve the confidentiality of sensitive materials like the information to which Cichosz was exposed, including by adding and enforcing provisions like that described above in Cichosz's Agreement, instructing high-level employees like Cichosz to guard such information closely, using encrypted servers to transfer and store sensitive information, designating materials as confidential or for internal use only, and obligating partners and customers to safeguard any confidential materials they receive in their dealings with Ivanti, including through binding agreements like the one Ivanti entered into with its "Smart TE" customer.

30.     In April 2014, when Ivanti's "Smart TE" prototypes had been fully developed and were being tested by Ivanti and its customer, Cichosz left Ivanti.   On information and belief, much like other former Ivanti employees before and after him, Cichosz was recruited by and ultimately left his employment with LANDesk to join StayLinked as its Vice President of Marketing and Business Development, in which role he continues today.

31.     In February 2015, Ivanti launched its new terminal emulation product that had been in development, with the help of Cichosz, for many months.

32.     For various reasons, Ivanti ultimately decided not to use the confidential "Smart TE" trade name when the product was launched.  For example, the product would be marketed to other customers beyond the customer for whom it was initially designed after the exclusivity arrangement ended.  The product suited the needs of virtually all of Ivanti's supply chain customers, as it was the first modern telnet product of its kind to incorporate a graphical user interface ("GUI"), full-touch environment, a Web browser, and a voice command option.

33.     The product, ultimately called "Ivanti Velocity (powered by Wavelink)," was met with widespread success, including with Ivanti's largest customers.  Customers were impressed with the product's GUI interface, full-touch environment, web browser capabilities, and voice command options, and Ivanti's novel go-to-market and branding campaign for the product resulted in a significant boost in sales and revenues almost immediately after the product's launch.

**StayLinked's Sudden Launch of Smart TE, Developed and Marketed Using Ivanti's Former Employees, Confidential Information, and Trade Secrets**

34.     At the time Ivanti launched its Velocity product in February 2015, StayLinked did not have a competing product.  Nor, and on information and belief, had StayLinked started developing one.

35.     In or around February 2016, a little less than a year after Ivanti's Velocity launch, StayLinked suddenly launched its own, competing terminal emulation product.

36.     To Ivanti's surprise, StayLinked named its competing product "Smart TE," the exact same confidential code name Ivanti had used prior to launching its product.  Like Ivanti's Velocity product, StayLinked's Smart TE product incorporated GUI; no prior StayLinked supply chain product had such capabilities.

37.     StayLinked's Smart TE product resembled Ivanti's in more ways than just its name and GUI functionality.  For example, the product was a marked departure from StayLinked's prior efforts to distinguish itself from Ivanti's products through distinct branding and marketing that, now with the Smart TE product, had become noticeably more polished and similar in appearance to Ivanti's branding and marketing of its terminal emulation products, allowing the product far more visibility in the market much like Ivanti's.  In addition,

10

StayLinked's go-to-market strategy with the product appeared to mirror Ivanti's, and could only have been based on information obtained from Ivanti insiders familiar with Ivanti's go-to-market processes and plans.

38.     On information and belief, StayLinked did not begin to develop its Smart TE product until after Cichosz was hired as StayLinked's Vice President of Marketing and Business Development.

39.     StayLinked is well aware of Ivanti's efforts to preserve its confidential information and trade secrets given its extensive history working with Ivanti and its predecessors, and its hiring of several former Ivanti employees subject to the same contractual obligations as Cichosz.  Such confidentiality provisions are also common-place in the industry and well-known to StayLinked.

40.     When Cichosz left Ivanti, he took virtually all of the confidential and proprietary information and trade secrets he had acquired with him.  Indeed, Cichosz reported to Ivanti, pursuant to his contractual obligation to do so, that he intended to return his Ivanti laptop before leaving, but that he unintentionally left the laptop on a plane and it was never recovered.  On information and belief, Cichosz in fact retained his laptop, and all of the sensitive information stored on it.  In addition, Cichosz requested and obtained sensitive royalty reports from Ivanti showing confidential pricing information for Ivanti's customers shortly before leaving to StayLinked.  On information and belief, Cichosz shared that information with StayLinked and StayLinked used that information to its benefit.

41.     On information and belief, Cichosz used the wealth of confidential information and trade secrets he had acquired in developing Ivanti's Velocity product to develop, market, and

launch, and aid others in developing, marketing, and launching for sale in interstate commerce StayLinked's Smart TE product.  The copying was wholesale, and on information and belief, relied on Ivanti's confidential business, technical, engineering, marketing, and pricing information.

42.     While StayLinked had historically copied many aspects of Ivanti's terminal emulation products by engineering products that looked similar and included similar features, StayLinked's Smart TE product rose to a new level of resemblance of Ivanti's product.  Indeed, the product used Ivanti's confidential code name, formulated in conjunction with Ivanti's largest customer, copied Ivanti's first-of-its kind GUI interface, and blatantly imitated the polished and well-branded appearance and function of Ivanti's product.

43.     On information and belief, Cichosz also provided sensitive, confidential, and protected pricing matrices, royalty reports, and customer marketing data related to Ivanti's terminal emulation business to StayLinked, resulting in a StayLinked product aimed specifically at Ivanti's customers' needs—knowable only by Ivanti employees like Cichosz—at a price point Cishosz knew would undercut Ivanti's competing business.

44.     Immediately after its launch in early 2016, StayLinked began using its Smart TE product as a platform to step up its marketing and branding and to compete directly with Ivanti for key supply chain customers, particularly the very customer for whom Ivanti developed its internal "Smart TE" prototypes, as well as other significant customers in the Asia-Pacific region. On information and belief, these efforts, too, have benefitted from confidential Ivanti marketing and branding plans and pricing matrices known only to Ivanti employees like Cichosz.

45.     In the months and now years since Smart TE's launch in early 2016, the product has become even more of a centerpiece of StayLinked's supply chain business, resulting in significantly increased revenues, customer opportunities, and market share in favor of StayLinked that would otherwise belong to Ivanti.  As just one example, StayLinked courted the second largest player in the supply chain industry immediately after launching its product, using its access to Ivanti's confidential customer information to aid it in obtaining that business that otherwise would have gone to Ivanti.

46.     Moreover, when StayLinked launched its Smart TE product, Ivanti was forced to reduce the price of its competing Velocity product in order to remain competitive with StayLinked.  Thus, even setting aside Ivanti's loss of market share and its corresponding loss of revenues, Ivanti's revenue generation and profitability have been directly and significantly impacted by StayLinked's introduction of Smart TE.  This pricing pressure continues today and is exacerbated by the fact that, on information and belief, StayLinked continues to use misappropriated knowledge of Ivanti's internal pricing and customer information to undercut Ivanti in the supply chain marketplace.

### StayLinked Raids Ivanti's Asia-Pacific Territory Business and Obtains and Misappropriates Additional Confidential Information and Trade Secrets

47.     StayLinked's effort to undermine Ivanti's position in the terminal emulation market by launching Smart TE was just the beginning of its campaign to build a terminal emulation business on Ivanti's back.  In late 2017, StayLinked, with its competing product in hand, was now only missing what would enable it to sell its competing product to key customers in the critical Asia-Pacific market: contacts and relationships with those customers that would allow StayLinked to get its foot in the door and undercut Ivanti's business.

13

48.     In late 2017, StayLinked began this second phase of its effort to undercut Ivanti's Asia-Pacific business the same way it had with its other competitive deficiencies—by recruiting and hiring an Ivanti employee who could give StayLinked the information and relationships they needed.  StayLinked set up recruiting meetings with Ivanti's then-Asia-Pacific Territory Manager, Stephen Shea, in or around September 2017 and persuaded Shea that if he left Ivanti for StayLinked, his contacts and experience for Ivanti in the Asia-Pacific region would enable StayLinked to build a superior business in the region, to Shea's economic benefit and Ivanti's harm.

49.     On information and belief, these recruiting meetings and discussions with Shea were attended by other former Ivanti employees, including Cichosz, in an effort to convince Shea that joining forces with StayLinked would provide him better opportunities than Ivanti.

50.     Persuaded by his former co-workers' recruitment efforts, Shea resigned from Ivanti abruptly in late 2017 after a long career with the company and its predecessors, claiming to his co-workers and superiors that he intended to take time off to care for his ailing parents in California.

51.     During Shea's transition out of his Territory Manager role with Ivanti, Shea—like Cichosz—failed in his contractual duties to return to Ivanti all sensitive and confidential information he had acquired, and instead took steps to attempt to cover his tracks with respect to the information he took with him, including wiping his Ivanti laptop of all Ivanti data before returning it.

52.     Less than a month after his abrupt resignation, Shea embarked on a solicitation tour of numerous Ivanti customers on behalf of StayLinked, including several top industry

players, in the Asia-Pacific region—where StayLinked previously had virtually no presence whatsoever in terms of its terminal emulation business.  On information and belief, Shea's solicitation tour was taken at the direction of and encouraged by StayLinked.

53.     During his meetings with Ivanti's customers on StayLinked's behalf, Shea denigrated Ivanti, its pricing, and its products, and attempted to persuade Ivanti's customers to switch to StayLinked's supply chain products and services.  Ivanti customers reported being confused that Shea—whom all of these contacts knew well from his years of work for Ivanti— was suddenly pitching competing StayLinked supply chain products.  Some customers even reported meeting with Shea under the assumption he was still selling Ivanti products, then being embarrassed to realize the bait-and-switch Shea had done to set up the meeting on behalf of an Ivanti competitor.  Customers also reported Shea discussing various technological benefits of StayLinked's products compared to Ivanti's and the more favorable pricing he could offer through StayLinked.

54.     Because Shea was bound by a similar agreement to Cichosz's, which included strict confidentiality, noncompetition, and nonsolicitation provisions, Ivanti brought suit against Shea in early 2018 seeking a temporary restraining order and injunction forcing him to comply with his contractual and other obligations (including by ceasing his solicitation of Ivanti customers and potential customers in the Asia-Pacific region and ceasing work for Ivanti's direct competitor, StayLinked).  *See Ivanti, Inc. v. Shea*, U.S. District Court, District of Utah, Case No. 2:18-cv-00092.  Ivanti successfully obtained a stipulated injunction in its 2018 lawsuit prohibiting Shea from, *inter alia*, competing with Ivanti in the Asia-Pacific region for the requisite 6 months.  This injunctive period was extended, because Shea violated the agreed terms

of the stipulated injunction before it could be entered by deleting confidential information from the laptop computer he was required to return to Ivanti for forensic inspection.

55.    Notice of Shea's injunction, which did not release StayLinked from any liability, was provided to StayLinked.  Under Rule 65 of the Utah Rules of Civil Procedure, StayLinked was accordingly bound to comply with the terms of the injunction, including those related to preserving documents and information.

56.    During the course of discovery related to the injunctive proceedings, Ivanti learned that, much like Cichosz, Shea had misappropriated and transferred to StayLinked multiple internal and confidential Ivanti strategic documents.  For example, in or around late 2017, StayLinked acquired from Shea a highly-sensitive Ivanti "battlecard" document that contained strategic information comparing the pluses and minuses of Ivanti's terminal emulation product offerings to StayLinked's.  StayLinked also acquired from Shea a confidential vendor contract Ivanti was negotiating with the same customer for whom Ivanti had developed its "Smart TE" prototypes.

57.    Shea confirmed that he shared with StayLinked confidential information concerning Ivanti's business relationships throughout the Asia-Pacific region, and StayLinked used that information in a solicitation tour of Ivanti's customers in the region.  Shea similarly acknowledged that he knew Ivanti's confidential pricing information, and that StayLinked used that confidential information to offer more favorable pricing terms (i.e., to undercut and harm Ivanti).

58.     As mentioned above, the foregoing information is highly confidential to Ivanti

and is protected under governing laws, and also by a contract between Shea and Ivanti.

Specifically, Shea agreed that he

> [s]hall not, except as authorised by the Company or required by applicable law,
> reveal to any person, firm or partnership, company, corporation, association,
> organisation or trust, any and all Confidential Information which may come to
> [his] knowledge during [his] employment with the Company, and [he] shall keep
> with complete secrecy the Confidential Information entrusted and/or received by
> [him] and shall not use or attempt to use any such information in any manner
> which may injure or cause loss either directly or indirectly to any LANDesk
> Group Company or its business or may be likely to do so.

 "Confidential Information" is defined in Shea's agreement as "any and all information which is

proprietary or confidential to any LANDesk Group Company or which any LANDesk Group

Company is required to keep confidential."

59. Under the same agreement, Shea agreed not to

> solicit or endeavor to solicit the custom of any person who is or
> has been, at any time during the period of Employment, a customer
> of the Company for the purpose of offering to such person goods
> or services similar to or competing with those of the business
> carried on by the Company.

StayLinked (through, at minimum, its executive Cichosz, whose Ivanti contract had the same

provisions) was aware of Shea's contractual confidentiality and non-solicitation obligations with

Ivanti.  StayLinked knowingly and intentionally caused and induced breaches of those Ivanti

contracts, including breaches of at least the confidentiality and non-solicitation provisions, to

harm Ivanti.  StayLinked also knowingly and intentionally interfered with Ivanti's relationships

with specific customers in the Asia-Pacific region through at a minimum misuse of confidential

information, commercial disparagement, and theft of goodwill, to harm Ivanti.

17

60.     On information and belief, Shea's and StayLinked's unlawful use of Ivanti's protected information during his tour of Ivanti contacts in the Asia-Pacific region has resulted in StayLinked securing business with potential or existing Ivanti customers in the region that it would not have won—and Ivanti would not have lost—but for Defendants' unlawful conduct, and in forcing Ivanti to lower prices and make concessions to retain existing customers and obtain new ones.  On information and belief, StayLinked obtained a lucrative partnership with at least one of those customers at Ivanti's expense, based on StayLinked's uses of misappropriated Ivanti information.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Utah Trade Secrets Act, Utah Code § 13-24-1 *et seq.***

61.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

62.     Ivanti enjoys an advantage over existing and would-be competition in the supply chain solutions marketplace by virtue of confidential information compiled over years of effort and investment of substantial amounts of capital.  This information belongs to Ivanti, and Ivanti retains the legal right to its ownership and use.

63.     Such information includes, but is not limited to, the identity of the customer with whom Ivanti was collaborating to build the product, which was confidential prior to its initial launch; the confidential terms of Ivanti's agreement with its customer, including Ivanti's confidential, 12-month exclusivity arrangement with the customer; Ivanti's vision and plan for developing a best-in-class, Android-based terminal emulation product in collaboration with its customer; detailed knowledge of and information regarding Ivanti's "Smart TE" prototypes, including product design, features, functionality, and troubleshooting; Ivanti's terminal

emulation marketing and go-to-market strategy, pricing, sales, and branding information;

customer royalty reports; and lists of actual and potential customers, their product preferences,

and other sensitive internal information valuable to Ivanti's customer relationships.  This also

includes "negative trade secrets"—the lessons Ivanti learned as to what would *not* work in a

"Smart TE" product, lessons learned only as a result of Ivanti's substantial investment in

research and development.  Such confidential and proprietary information also includes business

contacts, account mapping, pricing, sales, and other financial data, strategic sales and marketing

documents, and Ivanti "battlecards," as described above.  This information has independent

economic value by virtue of remaining secret, as the secrecy provides a market advantage for

Ivanti.

64.     This information constitutes trade secrets under the Utah Uniform Trade Secrets

Act, Utah Code Ann. § 13-24-1 *et seq*.

65.     Ivanti has taken extensive steps to preserve the confidential and proprietary nature

of this information, including through provisions like that described above in Cichosz's and

Shea's employee contracts, using encrypted servers to transfer and store sensitive information,

designating sensitive or proprietary materials as confidential or for internal use only, instructing

high-level employees with access to such information, like Cichosz and Shea, to hold it closely,

and obligating partners and customers to safeguard any confidential materials they receive in

their dealings with Ivanti.

66.     StayLinked has unlawfully acquired and used trade secrets belonging to Ivanti

without Ivanti's express or implied consent with knowledge or reason to know the trade secrets

were derived from persons who had utilized improper means to acquire them, or were derived from persons who owed a duty to Ivanti to maintain their secrecy.

67.     Both Shea and Cichosz acquired the foregoing trade secrets by improper means by breaching their respective explicit duties to maintain their secrecy, as provided in their agreements.  Further, based upon its long history of working with and competing against Ivanti, including by hiring multiple former Ivanti employees and receiving notice of Ivanti's injunction against Shea, StayLinked knew or had reason to know of Shea and Cichosz's obligations to maintain the secrecy of the trade secrets.  StayLinked therefore knew or had reason to know at the time of its misappropriation of Ivanti trade secrets that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy and/or limit or prohibit their use.

68.     StayLinked's misappropriation, acquisition, and use of Ivanti trade secrets has caused Ivanti, and will continue to cause Ivanti, substantial monetary damages in the form of lost sales and revenue, as well as irreparable harms such as loss of or harm to customer and business partner relationships, reputation, good will, and loss of competitive advantage in the supply chain mobility marketplace.

69.     On information and belief, StayLinked's misappropriation, acquisition, and use of Ivanti trade secrets are and continue to be willful and malicious.  For example, notwithstanding its knowledge of Ivanti's efforts to maintain the secrecy of its trade secrets, on information and belief, StayLinked continues to unlawfully use Ivanti's protected information in promoting and selling its Smart TE products.  Ivanti is accordingly entitled to punitive damages in an amount to be proven at trial.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

70.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

71.     Ivanti enjoys an advantage over existing and would-be competition in the supply chain solutions marketplace by virtue of confidential information compiled over years of effort and investment of substantial amounts of capital.  This information belongs to Ivanti, and Ivanti retains the legal right to its ownership and use.  This information has independent economic value by virtue of remaining secret, as the secrecy provides a market advantage for Ivanti.

72.     Such information includes, but is not limited to, the identity of the customer with whom Ivanti was collaborating to build the product, which was confidential prior to its initial launch; the confidential terms of Ivanti's agreement with its customer, including Ivanti's confidential, 12-month exclusivity arrangement with the customer; Ivanti's vision and plan for developing a best-in-class, Android-based terminal emulation product in collaboration with its customer; detailed knowledge of and information regarding Ivanti's "Smart TE" prototypes, including product design, features, functionality, and troubleshooting; Ivanti's terminal emulation marketing and go-to-market strategy, pricing, sales, and branding information; customer royalty reports; and lists of actual and potential customers, their product preferences, and other sensitive internal information valuable to Ivanti's customer relationships.  This also includes "negative trade secrets"—the lessons Ivanti learned as to what would *not* work in a "Smart TE" product, lessons learned only as a result of Ivanti's substantial investment in research and development.  Such confidential and proprietary information also includes business contacts, account mapping, pricing, sales, and other financial data, strategic sales and marketing

21

documents, and Ivanti "battlecards," as described above.  This information has independent economic value by virtue of remaining secret, as the secrecy provides a market advantage for Ivanti.

73.    Such confidential and proprietary information also includes business contacts, account mapping, pricing, sales, and other financial data, strategic sales and marketing documents, and Ivanti "battlecards," as described above.  This information has independent economic value by virtue of remaining secret, as the secrecy provides a market advantage for Ivanti.

74.    This information is directly related to Ivanti's products and services, which are sold in interstate commerce, and have been improperly used in StayLinked's products and services, which are also sold in interstate commerce.

75.    This information constitutes trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

76.    Ivanti has taken extensive steps to preserve the confidential and proprietary nature of this information, including through provisions like that described above in Cichosz's and Shea's employee contracts, using encrypted servers to transfer and store sensitive information, designating sensitive or proprietary materials as confidential or for internal use only, instructing high-level employees with access to such information, like Cichosz and Shea, to hold it closely, and obligating partners and customers to safeguard any confidential materials they receive in their dealings with Ivanti.

77.    On information and belief, StayLinked has unlawfully acquired and used a trade secret belonging to Ivanti without Ivanti's express or implied consent with knowledge or reason

to know the trade secrets were derived from persons who had utilized improper means to acquire them, or were derived from persons who owed a duty to Ivanti to maintain their secrecy.

78.     Both Shea and Cichosz acquired the foregoing trade secrets by improper means by breaching their respective explicit duties to maintain their secrecy, as provided in their Agreements.  Further, based upon its long history of working with and competing against Ivanti, including by hiring multiple former Ivanti employees and receiving notice of Ivanti's injunction against Shea, StayLinked knew or should have known of Shea's and Cichosz's obligations to maintain the secrecy of the trade secrets.  StayLinked therefore knew or should have known at the time of their misappropriation of Ivanti trade secrets that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy and/or limit or prohibit their use.

79.     All of the foregoing acts related to protected information StayLinked acquired from Shea and subsequently used occurred after the enactment of the federal Defense of Trade Secrets Act, beginning in or around October 5, 2017, and on information and belief, they continue today.  Further, on information and belief, StayLinked has unlawfully misappropriated, acquired, and used Ivanti trade secrets acquired from Cichosz after the enactment of the federal Defense of Trade Secrets Act.

80.     StayLinked's misappropriation, acquisition, and use of Ivanti trade secrets has caused, and will continue to cause, Ivanti substantial monetary damages in the form of lost sales and revenue, as well as irreparable harms such as loss of or harm to customer and business partner relationships, reputation, good will, and loss of competitive advantage in the supply chain mobility marketplace.

81.     On information and belief, StayLinked's misappropriation, acquisition, and use of Ivanti trade secrets are and continue to be willful and malicious.  For example, notwithstanding its knowledge of Ivanti's efforts to maintain the secrecy of its trade secrets, on information and belief, StayLinked continues to unlawfully use Ivanti's protected information.  Ivanti is accordingly entitled to punitive damages in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**Intentional Interference with Economic Relations**

82.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

83.     Ivanti has valid existing contractual relationships with its employees and former employees, including Shea and Cichosz.  At all relevant times herein, StayLinked had actual and constructive knowledge of the existence of Ivanti's contractual relationship with Shea and Cichosz.

84.     Ivanti spends considerable time, effort, and expense in creating, strengthening and maintaining its contractual employee relationships, and in protecting confidential information to which its employees have access.  StayLinked intentionally and improperly interfered with Ivanti's existing contractual relationship with Shea and Cishosz.

85.     StayLinked's interference with Ivanti's contractual relations is without justification and is by improper means.  Upon information and belief, the improper means by which StayLinked has interfered with Ivanti's contractual relations includes (without limitation) unlawfully inducing Shea to breach his non-competition, non-solicitation, and confidentiality obligations, as set forth above, and by unlawfully inducing Cichosz to breach his confidentiality

obligations, as set forth above through the breach of contract, making and inducing false statements, and the use of protected, confidential information.

86.     Additionally, Ivanti has valid existing economic and/or contractual relationships with its customers and partners, including in the Asia-Pacific region.  At all relevant times, StayLinked had actual and constructive knowledge of the existence of those relationships.

87.     Ivanti spends considerable time, effort, and expense in creating, strengthening, and maintaining its customer and partner relationships in the Asia-Pacific region, which relationships represent a significant source of revenue for Ivanti.  Ivanti's success in the region depends in critical part on the relationships it establishes with these customers and partners.

88.     StayLinked intentionally and improperly interfered with Ivanti's economic relations with its customers and partners in the Asia-Pacific region.  StayLinked's intentional acts were without justification and were by improper means.  Upon information and belief, the improper means by which StayLinked interfered with Ivanti's economic relations include (without limitation) inducing and encouraging Shea to engage in a solicitation "tour" of existing Ivanti customers and partners in the Asia-Pacific region in an effort to acquire business from those existing Ivanti customers and partners, including by using sensitive Ivanti information, all in violation of Shea's contractual obligations and in violation of other contractual obligations, misrepresentations and omissions, and use of protected or confidential information.

89.     StayLinked's interference with the foregoing relationships has caused and/or will cause injury to Ivanti's business in the form of lost sales and revenue, loss of current customers, partners, and market share, particularly in the Asia-Pacific region, and potential loss of current and prospective customers and partners in the Asia-Pacific region.

90.     By reason of StayLinked's improper interference with Ivanti's existing and prospective economic relations with its employees, customers, and partners, Ivanti has suffered, and will continue to suffer, actual and consequential damages in an amount to be proven at trial.

91.     Because StayLinked's conduct in each of the foregoing actions is intentional, willful, and malicious, and manifests a knowing and reckless indifference toward, and disregard of, the rights of Ivanti, Ivanti is entitled to recover exemplary damages against StayLinked in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### Permanent Injunction

92.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

93.     StayLinked is unlawfully acquiring and using Ivanti's confidential information, as described above.

94.     StayLinked has intentionally interfered with Ivanti's contractual and other economic relations with employees, customers, and business partners, as described above.

95.     StayLinked has violated the Utah Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1 *et seq.* and the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, by virtue of the conduct alleged herein.  The Utah Trade Secrets Act expressly provides for injunctive relief to remedy violations of the Act and to remedy "[a]ctual or threatened misappropriation."  Utah Code Ann. § 13-24-3.  The Defend Trade Secrets Act provides for similar relief.  *See* 18 U.S.C. § 1836(b)(3).

96.     As described above, StayLinked's conduct involves both actual and threatened misappropriation, and on information and belief, StayLinked's actual and threatened misappropriation continues to this day and will inevitably continue if the conduct is not enjoined.

97.     StayLinked's actions have caused, and will continue to cause, irreparable harm to Ivanti and its future business unless StayLinked is permanently enjoined by the Court from said unlawful conduct.

98.     Plaintiffs are entitled to an order permanently enjoining StayLinked from using, disclosing or exploiting Plaintiffs' trade secrets and confidential information or any part thereof.

**PRAYER FOR RELIEF**

WHEREFORE, by virtue of the foregoing acts complained of, Ivanti demands the following relief:

99.     On Counts I, II, III, and IV, for an injunction enjoining StayLinked from misappropriating or using any confidential information or trade secrets belonging to Ivanti, including by selling or marketing for sale any products conceived of, designed, constructed, marketed, or branded using Ivanti confidential information or trade secrets, and from interfering with Ivanti's economic and contractual relations.

100.     On Counts I, II, and III, for a monetary judgment against StayLinked in Ivanti's favor in an amount to be proven at trial, but in no event less than $75,001.

101.     The costs and attorneys' fees Ivanti incurred with respect to this action.

102.     All other relief the Court may deem appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Ivanti hereby requests a trial by jury as to all issues triable to a jury in this case.

Dated: February 1, 2019                    Respectfully submitted,


                                           /s/ Jess M. Krannich
                                           Jess M. Krannich (#14398)
                                           Christopher M. Glauser (#12101)
                                           Mitch M. Longson (#15661)
                                           MANNING CURTIS BRADSHAW &
                                           BEDNAR PLLC
                                           136 East South Temple, Suite 1300
                                           Salt Lake City, Utah 84111
                                           Telephone: (801) 363-5678
                                           Facsimile: (801) 364-5678
                                           jkrannich@mc2b.com
                                           cglauser@mc2b.com
                                           mlongson@mc2b.com

                                           *Attorneys for Plaintiff Ivanti, Inc.*